STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
FRANK J. RIEBLI (CABN 221152)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Eric.Cheng@usdoj.gov
    Frank.Riebli@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 21-121 JD |
| Plaintiff, | |
| v. | GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER |
| SIMON SAGE YBARRA, | |
| Defendant. | |

GOV'T MOT. TO DETAIN
CR 21-121 JD

## I. INTRODUCTION

A grand jury in the Northern District charged Simon Sage YBARRA and three others with conspiracy to obstruct justice by destroying evidence in an official proceeding, and with destroying evidence in official proceedings. Agents arrested YBARRA in Davis, CA in the morning on April 8, 2021, and brought him to Sacramento for his initial appearance on the charges in this district. Following a detention hearing at 2:00 p.m. today, on April 12, 2021, the magistrate judge in that district ordered YBARRA's release on an unsecured bond and certain other conditions. The government hereby appeals that release order. *See* Case No. 2:21-MJ-00058-CKD (E.D. Cal.).

## II. FACTS

### A. YBARRA Was Part of a Violent, Anti-Government Militia Group.

Jessie RUSH, Robert BLANCAS, Simon Sage YBARRA, and Kenny MIKSCH, were all members of an armed anti-government militia group called the "Grizzly Scouts" ("Grizzlies"). RUSH organized the Grizzlies and was the group's commanding officer. He gave himself the rank of Major. He made MIKSCH and BLANCAS lieutenants, and YBARRA a corporal. RUSH recruited several of the Grizzlies' members, including BLANCAS, YBARRA and MIKSCH, through a Facebook group he created. On the group's front page, he stated the group's association with so-called "boogaloo" extremists:[1] "they say the west won't boog, were [sic] here to gather like minded Californians who can network and establish local goon squads". Indeed, the "Grizzlies" discussed, trained, and prepared for violent confrontations with the government and attacks on law enforcement.

In May 2020, for example, the Grizzlies conducted a training operation at a protest in Sacramento. In preparation for that operation, they distributed an "Operations Order" that identified law enforcement as "enemy forces." They also established a so-called "QRF," or a Quick Reaction Force, that included RUSH and MIKSCH, in the event that the man they sent into the protest ran into trouble. The QRF's job was to rescue the recon element. QRF members were required to carry a rifle and pistol

---

[1] As explained in the indictment, "boogaloo" is a term sometimes used by certain militia extremists to reference a politically-motivated civil war or uprising against the government. The "boogaloo" is not a single cohesive group, but rather a loose concept, which has become a rallying point for some extremists.

GOV'T MOT. TO DETAIN                            1
CR 21-121 JD

and extra magazines.  They also considered the possibility of taking prisoners at the event.  As the operations order stated, "POWs will be searched for intel and gear, interrogated, stripped naked, blindfolded, driven away and released into the wilderness blindfolded with hands bound.  We will not execute POWs; however, we will not render medical aid to enemy WIA [wounded in action].  Enemy WIA will be given some water, searched for intel, interrogated, depending on nature of injury driven to the wilderness or left to their god."  In other words, the best outcome for a police officer the Grizzlies captured would be getting stripped naked and dumped in the wilderness, blindfolded and bound, quite possibly to die.

Towards the end of May and beginning June, the Grizzlies' discussions of attacks on law enforcement matured.  Between May 26 and 27, 2020, YBARRA and another Grizzlies member began to discuss plans.  YBARRA wrote, "I feel it.  I partially just want a concrete plan".[2]  "I feel like that one had some holes", he said.  The man YBARRA was communicating with said his vision was "cartel style."  YBARRA responded, "Bro we have to talk about this in person".  "There needs to be a protocol in place, and it needs to be done a certain way.  We can talk about this and reach an understanding about how this needs to work."  They agreed to meet in person the next day to discuss it.  And according to cell phone GPS location data and YBARRA's admissions to FBI agents, he and the other man did in fact meet that next day.  They met behind a gas station in Los Gatos, near YBARRA's home, and sat in the man's van and assembled an assault rifle.  The day after that, May 28, 2020, the man contacted YBARRA about attending a protest in Oakland the next day, on May 29, 2020, to "snipe some you know what's [sic]."  YBARRA does not appear to have responded, but the man is alleged to have ambushed two federal protective service officers that night, killing one and wounding another.  That murder and attempted murder are charged in a separate federal case arising out of that incident.

At the same time YBARRA was discussing plans to attack law enforcement with that man, he was also reporting those conversations to RUSH.  On May 26-27, 2020, he told RUSH that he had spoken with the man and that he "just wanted to make sure we are on the same page, and that targeting

---

[2] The undersigned is aware that periods generally go inside quotation marks.  However, when quoting a complete text message that lacked punctuation, it is more faithful to the original to end the quotation where the text message ended, and put the punctuation mark outside the quotation mark.

GOV'T MOT. TO DETAIN                                             2
CR 21-121 JD

innocents doesn't fly with me even if they are wearing a badge." RUSH agreed, but added, "yea we need to actually develop targets and cases, be smart. They want war, then we bring em war." In other words, it wasn't the idea of killing people that RUSH or YBARRA opposed, they just didn't want to kill low-value targets. RUSH confirmed this a moment later: "we can start developing case files, gathering intel, and doing it just like big bro does" "im not about the fireworks" "im more like a surgeon". RUSH also told YBARRA that "the gov spent 100s of thousands of dollars on training me, im gonna use that shit", meaning that he was going to put his military training to use in planning their attacks.

Beginning June 1, 2020 – just three days after the shootings in Oakland – the Grizzlies ratcheted up their preparation for attacks on law enforcement.[3] Another member sent the group a link to an article about the President considering whether to invoke the insurrection act to put down the nationwide protests in the wake of George Floyd's murder. "[T]hat ^^^ will be our sign," RUSH told them. "That effectively means the federal gov has declared war in things they're afraid of. Anything like this or a move that resonates with this is our trigger point. If y'all aint giving with that bail now", he said. In other words, RUSH was preparing the group for war against the government if the government invoked the Insurrection Act, 10 U.S.C. § 252. Again, RUSH told the group, "Get right with your gods, families and selves." "If you weren't ready, I sure as hell hope you fake the funk good," he added. "This is unfortunately one instance where fake it till you make it doesn't cut it," MIKSCH responded. "Fake it till you dirt nap", BLANCAS added. "I think it's time to swap your plates bud" RUSH told MIKSCH, meaning, it was time for MIKSCH to put heavier-duty protective plates in his bullet-proof vest.

By June 3, 2020, the Grizzlies began to discuss whether it would be better to provide aid to "Antifa" groups to encourage them to attack law enforcement first, then open their own campaign of violence against a (presumably) weakened police force. "It's the tactically sound option", BLANCAS said. "Them fucking each other up only helps us", he added. YBARRA said he thought aligning with those groups "would be short-sighted." "I don't want to get taken out of the fight before shit kicks off just because I engaged in a psy-op", he said. But one member went on to say "Tactically, we should be yeeting solo cops and taking their shit" and BLANCAS insisted that "Them fucking each other up only

---

[3] It is unclear whether the other Grizzlies knew at that point that one of their members may have been behind the shootings in Oakland on May 29, 2020.

GOV'T MOT. TO DETAIN                            3
CR 21-121 JD

helps us". In response, YBARRA gave a thumbs-up emoji. Step One, as BLANCAS saw it, was "Antifa" and police engaging in armed confrontation. "[S]tep two, cops win. Third step is we start yeeting cops when they're done. I'm also totally down with disguising ourselves as antifa and [yeeting] some cops that way", he said, meaning that he was willing to pose as member of "Antifa" and kill police officers as a way to kick off an all-out confrontation between the police and those groups.

      Throughout these conversations, one of their members advocated openly for attacking the police immediately. None of the other Grizzlies, including the defendants here, disagreed with him – to them, it was a question of "When," not "If." Three days later, on June 6, 2020 in Santa Cruz County, that same man is alleged to have gotten into a shootout with sheriff's deputies, killing one and wounding another. In the moments leading up to those shootings (which are the basis for pending state murder and attempted murder charges), the man communicated with the rest of the Grizzlies, asking them to come to his aid. The Grizzlies generally responded that they were too far away to get there in time, and advised him to delete the data on his phone and try to get away to a safe place where they could pick him up. MIKSCH – who later admitted to agents that he and the group generally listened to police scanners – notified the group that "they," meaning the sheriff's deputies, "have a dog," meaning a police K9 (which the deputies in fact had), but that he didn't think it was a planned raid because "[t]rue raids are usually done at like 3-4" in the morning. RUSH agreed. But the man seemed to believe the deputies were there for him. "Dudes I offed a fed" he told the other Grizzlies. RUSH's first response was to advise the man to destroy evidence and evade capture: he told the man to erase the evidence on his phone and "exfil," meaning, evade capture.

      Sheriff's deputies captured the man later that day, but the rest of the Grizzlies moved quickly to delete evidence. They erased from their phones all the previous group communications in which they discussed and planned to attack police, including the statements described above, and BLANCAS destroyed files related to the Grizzlies' operations. As BLANCAS told YBARRA a month later, "We burned tf [the fuck] out of everything" "All physical files I had were literally burned". But contrary to what they would all later tell FBI agents, the Grizzlies didn't disband. They just switched to a different communications platform, one they thought would be more secure.

      Nor did they appear chastened by the fact that one of their members could be involved with these

GOV'T MOT. TO DETAIN
CR 21-121 JD

4

officer shootings. Instead, in text messages the day after the second shootout, it was clear that they were mad at him for making it more difficult for them to operate as a group, but not for allegedly killing police officers. "He removed our platform and robbed our message", RUSH moaned. "Unfortunately we would almost have to wait for the next one," he said, meaning the next opportunity to spark civil war, "Which is disgusting". RUSH got over his heartache quickly though – within a couple weeks, he began contacting other Grizzlies and recruiting them to join him on the new communications platform. "Jump on [another communication's platform] if you miss us were [sic] reinventing and if you wanna be apart [sic] of it we'd love to have you back" he told one member.

### B. Agents Seized an Assault Rifle and Tactical Gear from YBARRA's Residence.

On August 6, 2020, agents from the Federal Bureau of Investigation ("FBI") executed search warrants at several locations, including RUSH's, BLANCAS's, YBARRA's, and MIKSCH's residences. They seized numerous assembled and disassembled weapons, including a disassembled .556 caliber assault rifle, magazines and .556 caliber ammunition, and a tactical vest, from YBARRA's residence.[4] Agents also seized YBARRA's cell phone. A subsequent examination of that phone showed that it was the same device YBARRA was using on June 6, 2020, when the Grizzlies were communicating with their member who allegedly engaged in a shootout with sheriff's deputies, and those communications were gone from his phone. YBARRA admitted to agents that he had deleted those communications.

Agents spoke to YBARRA again two more times following the August 6, 2020 search of his residence. Those were voluntary meetings.

### C. YBARRA's Arrest and Rule 5 Proceedings.

The grand jury indicted RUSH, BLANCAS, YBARRA, and MIKSCH on the present charges on March 23, 2021. On April 8, 2021, agents arrested YBARRA in Davis, California. Because they'd arrested him in the Eastern District of California, and because they arrested him in time to make his initial appearance in magistrate court there that same day, they took him to Sacramento to make his

---

[4] Some people believe that keeping disassembled rifles does not violate California law prohibiting the possession of an assault rifle. Even when disassembled, the rifle can be reassembled in seconds.

GOV'T MOT. TO DETAIN  5
CR 21-121 JD

initial appearance pursuant to Federal Rule of Criminal Procedure 5(c)(2). YBARRA made his initial appearance that afternoon, and at that hearing, he requested a continuance to Friday, April 9, 2021 and asked for a detention hearing. That hearing was then continued to Monday, April 12, 2021, at the government's request. Pre-Trial Services prepared a report in advance of the Friday hearing, and recommended release to a custodian (YBARRA's former legal guardian) on a $50,000 unsecured bond, as well as other conditions. The government sought detention.

Magistrate Judge Jeremy Peterson considered the parties' arguments and indicated his intent to order YBARRA's release. The government asked for a temporary stay of that release order so that the government could ask this Court to revoke the order. The magistrate judge declined to stay the release order. This motion to revoke followed.

## III.   DISCUSSION

### A.   Legal Standard

The government may ask the District Court to revoke a Magistrate Judge's pre-trial release order. 18 U.S.C. § 3145(a). Where a Magistrate Judge in another district orders a defendant's release (as part of a Rule 5 proceeding), the government may move the Court that has original jurisdiction over the offense charged to revoke that order. Id. Thus, this Court may review the Eastern District of California Magistrate Judge's release order. The District Court's review of the release order is de novo and "is to be conducted without deference to the magistrate's factual findings." United States v. Koenig, 912 F.2 1190, 1192 (9th Cir. 1990). Thus, this Court makes an independent determination regarding the risk of flight and the danger to the community that YBARRA poses if he is released.

The Bail Reform Act of 1984 permits pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where the defendant is either a danger to the community or a flight risk; it is not necessary to prove both. United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985). The government must prove danger by clear and convincing evidence, and flight risk by a preponderance. 18 U.S.C. § 3142(f)(2)(B); Motamedi, 767 F.2d at 1406. Categorical grants or denials of bail—untethered from an individualized determination—

are impermissible.  See United States v. Diaz-Hernandez, 943 F.3d 1196, 1199 (9th Cir. 2019).

The Court considers four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); United States v. Winsor, 785 F.2d 755, 757 (9th Cir. 1986).  Considering factors outside of those set forth in Section 3142 is disfavored.  Diaz-Hernandez, 943 F.3d at 1199.

**B.    YBARRA Destroyed Evidence Related to a Murder Investigation and Prosecution.**

The grand jury charged YBARRA and his co-defendants with conspiring to obstruct justice by destroying, and destroying, evidence that related to their fellow Grizzlies member's alleged involvement in a murder, and which revealed their own preparations to commit acts of violence.  The evidence of their guilt is strong:  the FBI recovered those communications from their fellow Grizzlies' phone because he didn't have time to delete them before he allegedly engaged sheriff's deputies in the second shootout, but the entire communication is gone from the defendants' phones – the same phones they were using when they exchanged those messages.  Moreover, their subsequent messages to others confirm what they did, and their use of the word "we" shows it was a concerted effort.

Though the weight of the evidence is the least important of the factors the Court considers, Motamedi, 767 F.2d at 1408, because the Court is not to pre-judge guilt at the detention stage, id. and 18 U.S.C. § 3142(j), it is nonetheless relevant to the Court's consideration of whether the defendant is a flight risk or a danger, Motamedi, 767 F.2d at 1408.  Here, the facts underlying the offense and the strength of the evidence show both that YBARRA is not amenable to supervision and that he is a danger to the community.  First, joining a conspiracy to obstruct justice and attempting to obstruct justice demonstrates a disregard for the rule of law, and that disregard indicates that he is not amenable to supervision.  Second, the way in which YBARRA and his co-conspirators obstructed and attempted to obstruct justice is especially concerning because they were attempting destroy evidence of an alleged

murder. And they wanted to ensure that, whatever legal trouble that man had caused himself, it would not impede their preparations for further violence. This factor weighs in favor of detention.

### C.  YBARRA Does Not Recognize the Government's or the Court's Authority.

The Court also considers YBARRA's history and personal characteristics. He has no prior criminal convictions and, until recently, had resided most of his life in the Northern District of California. Those factors ordinarily weigh in favor of release on strict conditions. But YBARRA's actions and his words demonstrate that he does not recognize the authority of any person or institution – including the Court – who would seek to limit what he believes is his right to do whatever he wants, and this indicates that he is not amenable to supervision. In a conversation in July 2020, just over a month after the Grizzlies had been forced into hiding by their member's apparent involvement in two shootings, YBARRA and BLANCAS discussed a then-recent position statement by a self-proclaimed leader in the boogaloo movement. "This 'council of boog' is already annoying me," BLANCAS said. "You see their new statement?" he asked. He then forwarded a press release titled, "Official Statement of the USBC's View of Law Enforcement." Among other things, the statement proclaimed that it was the duty of every American to push for the repeal of "unjust legislation" through legal, peaceful means. Id. The statement continued, "[w]e understand that the purpose of law enforcement agencies and their agents is to enforce the law . . . while the judicial process determines guilt or innocence and handles sentencing of those found guilty. We support law enforcement agencies and their agents in their efforts to enforce just laws, defend and support victims of crime, and defend the rights of individuals." Once again, the statement advocated for the "revocation or replacement" of "unjust laws" through legislatures. Id. YBARRA agreed with BLANCAS: "Yeah I feel like too much organization could really kill this movement, especially when fools start trying to talk for all of use when making radical statements like this addressed to the public," YBARRA said – the "radical statements" being the statement that the Boogaloo council supported peaceful efforts to promote change. "I see major danger in having someone represent us in a seemingly organized fashion and disclosing what laws we should and shouldn't be breaking," YBARRA continued. "First off, we are free men" he said.

Indeed, YBARRA made clear that he would not respect a court's authority if it attempted to limit what he views as his right to do whatever he wants: "IDGAF [I don't give a fuck] if a judge signs a

GOV'T MOT. TO DETAIN  
CR 21-121 JD

8

piece of paper excusing the infringement of my rights, it is still an infringement and should be treated as such" he said. "And yeah, if I have to shoot a tyrant in the face, I'm not reporting myself to another potential tyrant" YBARRA continued. "Fuckin a" BLANCAS agreed. "Fuck the council" "Fuck their shot" "That's not a thing I'm sticking to" BLANCAS said. Id. In other words, BLANCAS and YBARRA were too extreme even for other extremists.

YBARRA may claim that owning guns and tactical vests and planning to overthrow the government are protected activities. Whether or not that is true is immaterial here because YBARRA has not been charged here with such offenses. The fact that he had armed himself and the tenor of his communications on the topic are factors the Court can and should consider however, because they indicate that he was not just a "keyboard warrior." YBARRA was preparing himself for war against other people in his community – he was armed and trained for that confrontation. And he will have no regard for any conditions on his release that the Court may impose because, as he put it, he does not "GAF" what the Court says if he believes it infringes his absolute liberty. What is the bond form, if not a "piece of paper excusing the infringement of [his] rights," in his eyes? This is not the ordinary case where the defendant is alleged to have violated a law but does not appear to challenge the validity of the government's authority to enact or enforce the law in the first place. In that kind of case, the Court may have confidence – depending on the individual defendant's circumstances – that an appropriately stern admonition about adhering to the release conditions will help to ensure that the defendant complies. But here, YBARRA has demonstrated that he does not recognize the Court's authority to impose limitations on his movement, his right to own or possess firearms, or any other conditions the Court might find appropriate.

**D.    YBARRA Is a Danger to Pre-Trial Services and the Community.**

Finally, the Court considers the extent to which YBARRA's release would pose a danger to "any person or the community." 18 U.S.C. § 3142(g)(4). To begin, YBARRA's release would endanger whichever Pre-Trial Services Officer supervises him, and attempts to enforce conditions that he may not recognize as legitimate restrictions on his liberty.[5] Second, YBARRA and the other Grizzlies were

---

[5] YBARRA may counter that he offered no resistance on August 6, 2020, when agents executed a search warrant at his residence, or on April 8, 2021, when they arrested him. But these are not fair comparisons. On both occasions, because of the danger YBARRA represented, agents relied on surprise

GOV'T MOT. TO DETAIN                                    9
CR 21-121 JD

preparing for acts of violence.  If he is released, he will be free to re-engage with the other Grizzlies and resume those preparations.  The Court might try to limit his contact with other Grizzlies, but those limits are easily evaded by motivated users of technology (and the Grizzlies' prior communications indicate that they are), and it would not be possible – practically or legally – to prevent him from engaging with other extremists.  Third, YBARRA's crimes in this case involve the obstruction of justice by destroying evidence.  If allowed out of custody, he will be free to destroy any remaining evidence that he possesses or has the ability to access.  Thus, the government believes this factor also weighs against release.

### E.  YBARRA's Proposed Custodian Is Not a Sufficient Safeguard.

Finally, Pre-Trial Services recommended that YBARRA reside with his guardians and that one of them act as a custodian.  The government has no information about YBARRA's guardians beyond what is in the Pre-Trial Services bail report.  But as well-intentioned as they may be, YBARRA did all of the things described above while living under their roof.  This suggests that they have a limited ability to control him or prevent him from planning acts of violence and destroying evidence.  Accordingly, allowing YBARRA to reside with them, in their care, does not mitigate the risks described above.

## IV.   CONCLUSION

For the foregoing reasons, the government requests that the Court revoke the Magistrate Judge's release order.

DATED:  April 12, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_____/s/_____
ERIC CHENG
FRANK J. RIEBLI
Assistant United States Attorneys

---

and force to mitigate the danger to themselves and others.  Pre-Trial Services will not have the ability to do that.