STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ERIC CHENG (CABN 274118)
FRANK J. RIEBLI (CABN 221152)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Eric.Cheng@usdoj.gov
    Frank.Riebli@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 21-121 JD |
| Plaintiff, | |
| v. | GOVERNMENT'S REPLY I/S/O MOTION TO REVOKE RELEASE ORDER |
| SIMON SAGE YBARRA, | |
| Defendant. | Hearing: May 10, 2021<br>Time: 11:00 a.m. |

## I.  INTRODUCTION

In his opposition to the government's motion to revoke his bond, see Dkt #34, Simon Sage YBARRA does not dispute or even address any of the facts the government proffered showing that he was a member of a violent extremist group who himself had no respect for courts and the law. All he says is that the Court should disregard it all because the Court would have to presume his guilt in order to consider any of it. That is incorrect. The Court may and should consider those facts as evidence of the danger he poses to the community, the risk that he won't appear as the Court orders, and his unwillingness to comply with the conditions of his release.

YBARRA also argues that the conditions on his release that the Magistrate Judge imposed are sufficient to mitigate any danger or flight risk he poses. The government disagrees. First, YBARRA was living with his guardians when he armed himself, joined a violent extremist group, and began planning for armed confrontation with law enforcement. As well-meaning as his guardians may be, they do not appear able to detect and prevent him from engaging in exactly the behavior that brought him here. Second, the fact that YBARRA did not flee after the FBI first contacted him in August 2020, and that he continued to speak to the agents through the Fall and into 2021, does not indicate that he is neither a flight risk nor a danger. The tapes of those conversations indicate that YBARRA's strategy then was to try to convince the government not to charge him. That didn't work. He is thus in a different situation now, and his behavior between August 2020 and his arrest on April 8, 2021 says little about how he will behave in the future. For these reasons, and the reasons set forth in the government's motion, see Dkt #12, the government asks that the Court revoke his bond and remand him.

## II.  DISCUSSION

### A.  YBARRA Remains a Danger to the Community.

YBARRA does not dispute that he was a member of a violent extremist group that discussed and trained for armed confrontations with law enforcement. He does not dispute that he announced to another member of that group that he didn't respect a court's authority to issue an order limiting what he views as his absolute liberty. And he does not dispute that he told that member that, if he had to shoot a "tyrant"– meaning a government official – in the face, he wasn't going to report himself to another

"tyrant." Nor does he dispute that he had first-hand discussions with Steven Carrillo, the person charged with murdering one federal officer and attempting to murder another, or that they spoke about Carrillo's plans to carry out an ambush attack just days before Carrillo is alleged to have done it. And though YBARRA has denounced Carrillo, he maintains the same anti-government, anti-law enforcement views that led him to be involved with Carrillo in the first place. These facts show that YBARRA remains a danger to the community.

YBARRA asserts, without support, that the Court should not consider any of these facts because doing so would be to presume him guilty. Opp'n at 1:2-3; 2:10-14. That is not true. YBARRA's association with an extremist group and his statements indicating his lack of respect for a court's authority are of course factors the Court may and should consider. See, e.g., United States v. McGibney, 2020 WL 4746179, at *3 (N.D. Ind. Aug. 14, 2020) (ordering the detention of a boogaloo extremist with a distinguished record of service in the United States Marine Corps and no prior criminal history, and stating, "True, being a Boogaloo is not illegal. Nor is it illegal to harbor anti-government sentiments. But the Court is not determining guilt or innocence at this point. Rather, it is taking stock of Defendant's history and characteristics. The Court finds that membership in an organization that advocates for a second civil war, killing law enforcement along the way, speaks poorly of Defendant's character. Accordingly, this factor weighs in favor of detention."). See also United States v. Jenkins, 2017 WL 2985408, at *4 (M.D. Tenn. Jul. 13, 2017) (membership in the Gangster Disciples criminal street gang relevant to the court's assessment of the defendant's dangerousness); United States v. Digiacomo, 746 F. Supp. 1176, 1182 (D. Mass. 1990) (membership in the Mafia relevant to consideration of defendant's dangerousness and risk of non-appearance). Indeed, if YBARRA had been volunteering his time with an organization that benefited the community instead of seeking to tear it apart, he would insist that the Court consider that service in evaluating his suitability for release.

YBARRA says that he notified the government that he had recently started the purchase of two pistols, and that he didn't flee even after the FBI contacted him and searched his house in August 2020, and that these facts show he's amenable to supervision. Opp'n at 1, 3. They do not. First, the record as to YBARRA's recent effort to purchase two pistols is not as helpful as he claims. The FBI seized YBARRA's assault rifle during a search of his residence in August 2020. His recent effort to purchase

Case 3:21-cr-00121-JD   Document 38   Filed 05/04/21   Page 4 of 8

two pistols shows that he was attempting to re-arm himself. Further, when the Magistrate Judge in the Eastern District released YBARRA, the judge ordered that YBARRA neither possess nor have access to any firearms or ammunition, and that he provide written proof to the government that he had divested himself of any guns over which he had control. It does not appear that YBARRA mentioned to anyone at that time that he already had attempted to purchase more guns or was in the process of doing so. It was only after the Magistrate Judge had signed his release order and YBARRA had returned to the Northern District that YBARRA offered up this information. He shouldn't win points for making a belated disclosure when he kept this information from the Magistrate Judge who was evaluating whether he should be released. Moreover, the government has been unable to locate the pistols with the information YBARRA provided. The FBI contacted the Federal Firearms Licensee whom YBARRA said had his guns, but that FFL was unable to find any record that someone with YBARRA's name had purchased guns. While the government continues to work with YBARRA's attorney on this issue, as of this filing, the government has been unable to locate the guns YBARRA apparently bought.

YBARRA also claims that he met with agents numerous times before his arrest and did not flee. Though it is more accurate to say that he spoke with agents numerous times between August 6, 2020, when the FBI executed a search warrant at his residence, and April 8, 2021, when the FBI arrested him, his voluntary contacts with the FBI don't show that he's neither a flight risk nor a danger.[1] YBARRA's principal concern in these conversations appears to have been to avoid getting charged, so he spent much of that time trying to convince the FBI agents that he was not involved in Steven Carrillo's May 29, 2020 ambush murder and attempted murder in Oakland, and trying to strike a deal to avoid prosecution. That didn't work out as he'd hoped, and now he's been charged. His pre-charge efforts at engagement say little about how he will behave now.

Moreover, the recordings of those conversations show that YBARRA had no change of heart or was any less an extremist than when he and the other Grizzlies were training for armed conflict with law

---

[1] On August 6, 2020, FBI agents executed a search warrant at YBARRA's residence in Los Gatos. He spoke with the agents that day. Two agents called him four days later, on August 10, 2020, and spoke to him by phone for about 90 minutes. On October 27, 2020, two agents met him in a park in Los Gatos and spoke with him for about an hour and 40 minutes. On November 24, 2020, agents spoke with YBARRA by phone for about 42 minutes. On December 15, 2020, the agents met with YBARRA again for about 90 minutes.

GOV'T MOT. TO DETAIN
CR 21-121 JD
3

enforcement. During his October 27, 2020 meeting with FBI agents, for example, YBARRA said that the reason the Grizzlies deleted evidence of their involvement with Carrillo and didn't bring that evidence to law enforcement was that, "[i]n today's climate, people with the mind-set to actually go out and train and engage with a well-regulated militia, are fairly wary of law enforcement types because it comes with the territory, we're not sure whether they're on the side of the people or not." In other words, the reason the Grizzlies, including YBARRA, destroyed evidence related to a murder case is that they couldn't be sure that the officers investigating that murder were on the side of "the people."[2] The fact that YBARRA drew this distinction between law enforcement and "the people" in his conversations with the FBI in October 2020, shows how firmly committed he is to the views that led him to join an extremist group in the first place.

When the agents asked YBARRA about his use of the term "well-regulated militia," he lectured them on the Second Amendment. He added that, in May and June 2020, there were "blatant threats by politicians saying they were going to break their oaths of office in order to aggress against the people." This apparently was a reference to the Virginia Governor's 2019 promise to pursue gun-control laws that would have banned the sale of assault rifles and the possession of high-capacity magazines. The fact that YBARRA saw a legislative agenda as a violation of the Governor's oath of office and an act of aggression against the citizens of Virginia shows how extreme his views were and are.

YBARRA repeated this sentiment in his November 24, 2020 call with the FBI, when he told the agents that it would have been easier for the Grizzlies to come forward about Carrillo if they were in a state that "respected the people's right to form a militia."[3] This shows that YBARRA maintains the

---

[2] It's not clear which "people" he meant, but it evidently did not include the families of the victims who were relying on law enforcement to find the assailants.

[3] YBARRA apparently holds the mistaken view – perpetuated by extremists – that they have a constitutional right to form private militias. They do not. See, e.g., Presser v. Illinois, 116 U.S. 252, 267-68 (1886) ("It cannot be successfully questioned that the state governments, unless restrained by their own constitutions, have the power to regulate or prohibit associations and meetings of the people . . . and have also the power to control and regulate the organization, drilling, and parading of military bodies and associations, except when such bodies or associations, are authorized by the militia laws of the United States. The exercise of this power by the states is necessary to the public peace, safety, and good order. To deny the power would be to deny the right of the state to disperse assemblages organized for sedition and treason, and the right to suppress armed mobs bent on riot and rapine."); District of Columbia v. Heller, 554 U.S. 570, 620-21 (2008) (endorsing Presser); Cal. Penal Code § 11460 (making it a misdemeanor for "[a]ny two or more persons [to] assemble as a paramilitary organization for the purpose of practicing with weapons," and defining "paramilitary organizations" as

same extremist views that led him to join the Grizzlies in the first place. And that's why he remains a danger to the community.

### B. The Bond Conditions Do Not Mitigate the Risk YBARRA Poses.

The Magistrate Judge released YBARRA to the custody of his guardian, with his "father" and "mother" guardians as sureties on a $50,000 unsecured bond. YBARRA argues, citing United States v. Ailemen, 165 F.R.D. 571, 580 (N.D. Cal. 1996), that the Court must consider detention in relation to release on conditions, and that these conditions (and the others the court imposed) are sufficient to mitigate any risks of danger or flight YBARRA poses. Though as a general matter it's true that the Court considers detention vis-à-vis release on conditions, Ailemen doesn't help YBARRA's argument. The issue in Ailemen was whether the defendant's lengthy pre-trial detention violated his right to Due Process, and the Magistrate Judge there balanced three factors – the expected length of pre-trial detention, whether the government was responsible for the delay, and the "regulatory" interests served by continued detention – in resolving that issue. Id. at 589. The defendant in that case had been in custody for 26 months, and it appeared that his case would not go to trial for at least another nine months. Id. "[T]he length of detention prong of the due process analysis weighs strongly in favor of releasing Ailemen," the Magistrate Judge found, and thus the other two factors "will have to weigh strongly in favor of the government to justify continued detention." Id. at 591. They did not, the Court found, in part because the Court believed it could release the defendant to house arrest in a "highly regimented, well-supervised half-way house" where staff could monitor his behavior, and this restriction sufficiently mitigated the danger he posed that it no longer outweighed the extended incarceration he'd already borne. Id. at 596.

Here, YBARRA has spent four days in custody so far and there is no indication that his case will remain pending for an unreasonably long time. Moreover, neither Pre-Trial Services nor YBARRA's guardians can be expected to provide the kind of supervision YBARRA requires. Last year, YBARRA armed himself and obtained tactical gear, joined an extremist group, and planned for violent confrontations with law enforcement, all while living with these same guardians. His guardians may

---

organizations which are "not an agency of the United States government or the State of California").

mean well, but they failed to see these things as indicators of radicalization before; it is not clear that they will be able to spot the signs that he is re-engaging with extremist groups or re-arming himself. YBARRA counters that his parents are now "sensitized" to the issue, and that his "father" is an expert in internet security, and that his guardians thus will provide adequate supervision.  It is not clear what it means that his "father" is an expert in internet security, or how that applies here – this isn't a hacking case or a case involving malware or other issues that typically fall under the heading "internet security." YBARRA met his co-defendants on Facebook and they communicated over the phone and with common messaging applications.  Unless YBARRA is representing that his guardian has installed monitoring software on his internet device(s), similar to that which Pre-Trial services installed on Jesse Rush's phone,[4] his guardian's familiarity with computers doesn't provide any assurance that YBARRA will not re-engage with extremist groups.

In addition, YBARRA has been charged with obstructing justice by destroying records that not only implicated one of his fellow extremists, but also showed YBARRA's own involvement with that person and YBARRA's and the group's discussions and plans related to attacks on law enforcement. Nothing about his release conditions prevents him from continuing to impede these proceedings.

Finally, nothing YBARRA has said indicates a change in his view – which he expressed repeatedly to his fellow extremists – that the government (including the Court) does not have the authority to limit what he views as his absolute liberty.  That's the difference between a defendant like YBARRA and a defendant in an ordinary drug or gun case.  In the usual case, the defendant may dispute the charges against him, but generally, he doesn't dispute the government's or the Court's authority to regulate his conduct.  In those cases, it is at least plausible that the defendant will abide the conditions the Court puts on his release because he recognizes the Court's authority to do so.  Here, YBARRA's own words show he does accept one of the most basic principles of our constitutional democracy, namely, that legislatures and courts have the authority to regulate his conduct:  he said, "IDGAF [I don't give a fuck] if a judge signs a piece of paper excusing the infringement of my rights, it is still an infringement and should be treated as such," meaning, he has the right to oppose that "infringement"

---

[4] The Court released Rush on a bond, but limited him to a single internet-enabled device, and required that he allow Pre-Trial to install monitoring software on it.

GOV'T MOT. TO DETAIN                                6
CR 21-121 JD

with force. It is for this reason that his adherence to extremist views matters. The Court cannot expect him to abide conditions that he does not believe the Court has the right to impose. It is for this reason that the government maintains he is not amenable to supervision, and releasing him to the custody of his guardians with an unsecured bond will not change that fact.

### III. CONCLUSION

For the foregoing reasons, the government requests that the Court revoke the Magistrate Judge's release order.

DATED: May 4, 2021

Respectfully submitted,

STEPHANIE M. HINDS
Acting United States Attorney

_____/s/_____
ERIC CHENG
FRANK J. RIEBLI
Assistant United States Attorneys